**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
**CASE NO. 0:23-cv-60012-SINGHAL/VALLE**

**KEVIN MURRAY,**

      Plaintiff,

vs.

**LEARJET,**

      a Foreign for- Profit Corporation,

      Defendant.

_____/

<u>**FIRST AMENDED COMPLAINT**</u>

**COMES NOW** Plaintiff, KEVIN MURRAY, (hereinafter called "Plaintiff" or "MURRAY"), by and through his undersigned counsel, and, pursuant to Fed. R.Civ.P.15(a) and S.D.Fla.L.R.15.1, hereby files his First Amended Complaint against Defendant LEARJET, INC (hereinafter also called "Defendant," "Employer" or "Learjet"), and states as follows:

## I.   <u>NATURE OF THE ACTION</u>

1. In this an action based on unlawful race discrimination, including harassment, and retaliation, Plaintiff seeks declaratory, permanent injunctive, and monetary relief to redress the deprivation of his civil rights as prohibited by Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. §1981(b) ("Section 1981"), and Florida Civil Rights Act, Florida Statutes, §§ 760.10, *et seq.* ("FCRA"), which prohibit, *inter alia,* the discriminatory denial of terms and conditions of employment, including loss of compensation from hostile work environment discharge from employment, and other adverse actions based on race, color, national origin, or age.

2.     The unlawful actions of LEARJET have caused MURRAY extreme mental anguish; outrage; depression; painful embarrassment among his family, friends, and former fellow employees; stress-induced insomnia; humiliation; disruption of his personal life; and loss of the ordinary pleasures of everyday life.

## II.     JURISDICTION AND VENUE

3.     As this action arises under Title VII and Section 1981, jurisdiction is founded on 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331 and 1343(a)(4), respectively.

4.     The Court has jurisdiction to grant declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5.     Furthermore, the Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's claims under the Florida Civil Rights Act of 1992, Fla. Stat. §§ 760.01, *et seq.,* ("FCRA").

6.     Venue is proper in this Court as all acts and omissions giving rise to the claims and other adverse actions relevant to this cause occurred in Broward County, under the venue designation of the United States District Court for the Southern District of Florida.

## III.     SATISFACTION OF CONDITIONS PRECEDENT

7.     Plaintiff has exhausted his Title VII and FCRA administrative remedies, pursuant to 42 U.S.C. § 2000e5(f)(3) and Fla. Stat.§ 760.11(1), by filing charges of unlawful race and retaliatory discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

8.     The EEOC issued the Plaintiff a Notice of the Right to Sue that was received on June 6, 2022, within 90 days of his receipt of which he initiated this action.

9.     As to the FCRA, more than 180 days elapsed from his filing the Charges of

Discrimination without the FCHR either conciliating the charges or making a finding adverse to him.

10.     All other conditions precedent have been satisfied or waived.

## IV.   PARTIES

11.     Plaintiff is an Black male citizen of the United States of America and resides in Miami Dade County, Florida. He is protected by Title VII, Section 1981, and the FCRA because:

    a.     he is an African American person who suffered unlawful discrimination;

    b.     he opposed what he reasonably believed to be his Employer's behavior that was made unlawful acts by each of the three statutes – Title VII Section 1981 and the FCRA

12.     Defendant LEARJET is a Foreign for-profit corporation existing under the laws of Canada with its principal place of business at One Learjet Way, Wichita, KS, 67209, but is licensed to and doing business within this judicial district and is an "employer" as envisioned by  42 U.S.C. § 2000e(b) and § 760.02(7), Fla. Stat.(2019).

## V.    APPLICABLE STATUTORY PROVISIONS

13.     Title VII provides, in pertinent part, at 42 U.S.C. Section 2000 e - 2 (a) that:

    It shall be an unlawful employment practice for an employer —

    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his **compensation, terms, conditions, or privileges of employment**, **because of such individual's ... race** ...; or

    (2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an

employee, because of such individual's ... race....

14.    Title VII further provides at 42 U.S.C. § 2000e-3(a) as follows:

> Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... **because he has opposed any practice made an unlawful employment practice by this title**, or because he has made a charge under this title.

15.    The FCRA provides in pertinent part at § 760.10(1), Fla. Stat. (2011) as

follows:

> It is an unlawful employment practice for an employer:
>
>     (a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's ... race ....

16.    The FCRA further provides at § 760.10(7), Fla. Stat. (2019) that:

> It is an unlawful employment practice for an employer to discriminate against any person because that person has opposed any practice which an unlawful employment practice under this section is, or because that person has made a charge ... under this section.

17. The amendments to Section 1981 of the Civil Rights Act of 1866, through the Civil

Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071-1100 (codified as amended in

scattered sections of 42 U.S.C. (Supp. III 1992), provide:

> **§ 1981 – Equal Rights Under the Law**
>
> **(a)   Statement of equal rights**. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined.** For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment.** The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

## VI.  FACTUAL ALLEGATIONS

18.     At all times relevant and material, Plaintiff was employed by LEARJET and Plaintiff was qualified for and performed satisfactorily in all positions he held and applied for with Defendant.

19.     During his employment, and particularly from on or about from July 29, 2002, through the termination of his employment, with regard to this action, Plaintiff endured a continuous pattern of hostile and abusive conduct by LEARJET on account of his race which substantially altered and change this terms and conditions of employment to which is Caucasian and non-black coworkers were subjected.

20.     It was, indeed, this persistent career-long hostile and abusive conduct on account of his race which resulted in a hostile work environment until Plaintiff, as any reasonable person under those circumstances, would have felt compelled to separate from LEARJET.

21.     MURRAY commenced his employment with LEARJET, at its place of business in Fort Lauderdale, Florida, on or about July 29, 2002, as an Air Frame and Powerplant technician.

22.     When MURRAY began working with the Defendant, and at all times thereafter pertinent to this action, LEARJET was a wholly owned subsidiary of BOMBARDIER, INC.,("BOMBARDIER") a Canadian business jet manufacturing company.

23.     BOMBARDIER manufactured a series of corporate jets that are referenced herein, including the: Global 7500 and the Global Express.

24.     Immediately before MURRAY commenced his employment with LEARJET, he worked for a customer of LEARJET, Turnberry Associates Corporation, in its aircraft maintenance department, as an Airframe and Powerplant (A&P) mechanic; also referred to as A&P Technician.

25.     A&P mechanics are certified generalist mechanics who can independently perform many maintenance and alteration tasks on aircraft.

26.     A&P mechanics repair and maintain most parts of an aircraft, including the engines, landing gear, brakes, and air-conditioning system. Some specialized activities require additional experience and certification.

27.     As a result of that prior employment of Plaintiff, he was already experienced on BOMBARDIER products when hired; significantly more experienced than entry-level A&P Technicians. MURRAY'S performance was, throughout his entire employment with LEARJET, exceptional, without fail.

28.     Within three months of his employment with LEARJET, due to his coworkers' lack of comparable skills and abilities, he was promoted to inspector.

29.     However, MURRAY was also called upon to perform normal duties as an A&P Technician.

30.     This assignment of responsibilities to Plaintiff that were more complex and arduous, began LEARJET'S pattern of demanding him to perform responsibilities that were not demanded of his Caucasian and nonblack A&P Technician coworkers.

31.     This pattern escalated into LEARJET directing him to perform a variety of and numerous undesirable tasks that were not assigned to his Caucasian and nonblack

coworkers.

32.     During his employment with LEARJET, he became a principal systems troubleshooter in all related aircraft systems and was assigned those responsibilities.

33.     These high-risk arduous tasks and racially disparate assignments to MURRAY was so continuously and physically and mentally demanding that he carried significantly higher burdens than his Caucasian and nonblack coworkers, and this made  his work environment abusive all because of his race.

34.     Because the pattern of unfair and uneven disparate assignments occurred with such regularity the precise assignments over the 20-year period will have to be gleaned from the employee's records.

35.     The safety and maintenance records which reflect this pattern of racial disparate assignments are permanently  part of regulations from the Federal Aviation Authority ("FAA").

36.     During the course of my employment with LEARJET, assignments were ordinarily made to the pool of technicians. These assignments are done with the company's Operations Manager and Shift Supervisors along with Lead Technicians and are eventually passed on to the particular Technician.

37.     Specifically, some of the Caucasian and nonblack coworkers who never asked to perform Global engine changes, troubleshoot complex aircraft systems, Variable Frequency Generator  vibration testing, and high-power engine runs or vibration surveys were Kelly Eaton, Mike Moore, Gene Carol, Douglas Parker, Charles Dupuis, John Blocks, and Megan Bumpus.

38.     Additionally, it was routine that certain procedures which were difficult but had to be accomplished were deliberately left untouched through several sheriffs on Plaintiff's

days or until his return to work the following week. An example of this, shortly before Plaintiff's separation of employment, involved a former white male employee, Guillerme Pizanelli ("Pizanelli") who became a customer of LEARJET.

39.    Plaintiff trained Pizanelli on the Challenger 300 engine run and taxi. His aircraft was misdiagnosed on a faulty Auto Throttle issue. The graft was dismantled significantly by the Customer Response Team ("CRT"), without success. Plaintiff's troubleshooting skills were again requested, rather than being assigned to pool. As always, Plaintiff performed the assignment and recommended replacing the related computer.

40.    Plaintiff's recommendation was ignored, and the aircraft was dismantled again. This resulted in major safety of flight issues at great financial cost to the company. Yet, the burden of noncompliance fell on Plaintiff.

41.    In the fall of 2018, as another example of the systemic racial disparity, two Caucasian techs, Matt Blough and Megan Bumpus, were selected to receive training on the VFG vibration testing procedures which required specialized equipment.

42.    Plaintiff was not given that training opportunity, although the selection for the training was through an informal selection process whereby the supervisors, with the consent of the Operations Manager, selected whomever they desired. Ordinarily, those selected for training are those who were given or expected to be given assignments for which specialized training is required.  Because of Plaintiff's accumulated experience and desire to always be a top performer, he engaged in independent study and evaluations in order to perform numerous tasks.

43.    This self-training was the case with selectees for the formal training Matt Blough

and Megan Bumpus were given. Nonetheless, Plaintiff had to perform these tests on multiple aircraft with no training from the company. He even consulted by then CRTtech Shannon McDonald on a trip in Europe on how to perform this task. None of the formally trained Technicians, particularly Matt Blough and Megan Bumpus, successfully performed these tasks. Both received compensatory and status recognition, enhanced formal records training, denied Plaintiff.

44.     To exacerbate the abusive discrimination, Ramon Rios ("Rios"), white male Lead Technician, while thanking Plaintiff for providing the services Matt Blough and Megan Bumpus would not or could not perform, he would also routinely subject Plaintiff to harsh criticisms for the slightest error, even if it was not committed by him.

45.     Another example of Rios' racially disparate treatment occurred in late 2018 when Plaintiff was led directly from the parking lot into an aircraft cockpit to immediately start the engines, taxi out to the runway area and assist vendor technicians in completing critical adjustments during dayshift's allotted time.

46.     None of the available Caucasian A&P technicians were directed to perform his responsibilities even though the work had to be done during their assigned shifts.

47.     In addition to Plaintiff's white male supervisor, Tim Freeman, other company managers and supervisors - all of whom were white males - were also aware of the specific abusive disparities and treatment. They included Rich Meilert, Ron Lowe, Tim Freeman, Gary Sevarino, and Jim Heasley.

48.     The referenced supervisors were also aware, in late 2018 - early 2019, when dayshift avionics lead technician Jaime Pelchat refused to assist in the effort to diagnose avionics related problem presented by a customer by the name of Villafane. After Plaintiff

successfully addressed the problem, Jaime Pelchat disparagingly mocked him to the Shift supervisor - vilifying his efforts.

49.     During this same period of time, two white male A&P Technicians (names unknown but company's records will reveal) were sent to Montreal for training on VFG vibration testing and performing critical Rolls Royce manufactured Global Express engine changes. This allowed the facility to be certified.

50.     On their return, however, the Plaintiff was given the task of conducting complicated tests with no training from anyone including the two freshly trained technicians, except for some assistance from Rolls-Royce technicians who were temporarily engaged Yet, he managed to carry out this task correctly and efficiently on those many aircraft, each within the course of his shift. Following this, plaintiff was required to train other technicians on those tasks.

51.     Even after the end of the services provided by Rolls-Royce technicians, referred to in the preceding paragraph, white male supervisor, Bob Conroy directed that he should continue performing the extraordinarily taxing engine change task (removed of 5000 lb. engines).

52.     Plaintiff was able to complete the engine removal without being assigned adequate help, save assistance from a junior black male technician, Roy Hamilton.

53.     While Plaintiff was able to fulfill his repair objectives through placement of the aircraft in a unique position, he and the assistant were ridiculed by the management team for themselves, while at the same time letting it remain as Plaintiff had placed it.

54.     Plaintiff's efforts eventually resulted in the sought-after certification LEARJET needed.

55.     The Company, throughout Plaintiff's employment, maintained a policy of not disclosing terms and conditions of employment, including compensation, to employees in general.

56.     Throughout Plaintiff's employment, all of his performance evaluations were favorable and resulted in small wage increases. He was not aware of the specific amount of increase in wages his white coworkers with similar job titles were receiving or how the details of their performance were assessed and reflected in LEARJET'S employment records.

57.     Plaintiff's awareness of LEARJET'S continuous pattern of race discrimination in terms, benefits and conditions of employment was heightened during the in late 2018 - early 2019 period when various Caucasian coworkers and supervisors would raise questions about his level of pay without directly addressing the race-based discrimination being the source of any differences.

58.     Shortly after those informal discussions various Caucasian coworkers and supervisors wherein he formed the clear and firm belief that he and other black coworkers were grossly underpaid comparatively to his white counterparts,  Plaintiff availed himself of the opportunity, while performing a difficult removal of an engine pylon apron for repair under an assignment by the referenced white male Operations Manager Jim Heasley, to complain about and object to the continuous pattern of race discrimination in pay and assignments.

59.     Operations Manager Jim Heasley, although aware of the aforementioned disparities in abusive assignments, and the ongoing race discrimination, he dismissively rejected Plaintiff's complaint and objection and it stated, "you are probably making more

than you should." He did not specifically respond to Plaintiff's complaints about the disparities in abusive assignments except to pretend that it did not exist.

60.     Heasley did respond, however, that no request that he review all my files, records of exceptional contributions (acknowledged by him) as well as peer review to investigate the disparity. He further stated that that he was not in possession of the scales and formulas at the time to make an assessment.

61.     In furtherance of my opposition to the race discrimination – since Operations Manager Heasley claimed to not have all of the details - and Plaintiff further presented his complaints to the then director of human resources, Gabriel Zaidman ("Zaidman"), white female.

62.     Zaidman's revealed in her response to Plaintiff that the company was in the process of reviewing pay issues. She acknowledged "a level of abuse" and suggested if one desires a pay increase, one should leave the company, and return; one would then be paid substantially more in returning.

63.     Shortly after Plaintiff's conversation with Zaidman, he noticed an increase in his wages, but more unwarranted criticism of his work and an increase in undesirable assignments.

64.     With regard in Plaintiff's wages, he did not know at the time of his pay increase that LEARJET was undergoing an investigation by the Department of labor's ("DOL") Office of Federal Contract Compliance ("OFCCP") on failure to comply with Executive Order 11246, specifically regarding its systemic failure to pay its black Technicians comparably to their white counterparts.

65.     OFCCP's investigation did not address the race discrimination in other terms and conditions of employment faced by its black technicians including subjecting them, as

Plaintiff was, to a hostile and abusive work environment based on race.

66.     OFCCP's investigation was also limited to review of records and data for compliance with Executive Order 11 246 for the two-year period ending May 13, 2016.

67.     Racial disparities and assignments continued through plaintiff's last day of active employment, the COVID-19 driven furlough.

68.     The identified Caucasian and non-back coworkers, referenced in paragraph 37 above, but also the beneficiaries of higher compensation, while not being required to perform the numerous and arduous tasks referenced herein.

69.     Even entry-level white coworkers with lesser qualifications training and background were paid significantly more than Plaintiff, including, Marcia Castro and Dimitreos 'Jimmy' Delitsis, upon the commencement of their employment.

70.     Other examples of the retaliation against Plaintiff for making his complaint and opposition to the unlawful practice of LEARJET include the actions of Ramon Rios, dayshift Lead Technician, or Shift Supervisor referenced in paragraphs 44 and 45 above.

71.     Rios was a part of Plaintiff's supervisory line, through whom Operations Manager Heasley (with whom Plaintiff lodged his complaint of and opposition to ongoing race discrimination) gave or approved assignments, including the distinctly arduous and undesirable ones.

72.     During this same post-opposition time frame, late 2018 - early 2019, Rios assigned MURRAY to perform the task of aircraft return for service inspection, although Rios should have done it as the dayshift Lead Technician. In performing the assignment, Plaintiff detected numerous discrepancies such as missing seals, unfinished sealant and remnants from the paint department.

73.     The completion of this service inspection task was the responsibility of the paint

department in which the Lead Painter, Chris Leptien, offered to correct. Rios, however, not only intensified his unwarranted criticism of Plaintiff, but he also sought his termination of employment, although the error was not Plaintiff's.

74.    Rios' intention to force Plaintiff out of the workplace (after the lodged his opposition to the unlawful discrimination) was confirmed by another member of MURRAY'S supervisory line, Tim Freeman, white male, who specifically informed Plaintiff that Rios was trying to "set him up" to fire him.

75.    The unwarranted and disparaging criticisms of Plaintiff's work after he lodged his complaint and opposition to the systemic race discrimination to the Operations Manager and Human Resources director, spread and other supervisors – who also worked on Plaintiff's supervisory line with Heasley.

76.    Dave Leadley, white male, and then Lead Technician, also directed Plaintiff to complete an unfinished work order entry, previously assigned another A&P technician. When Plaintiff reminded Leadley of the responsibility of the white co-worker, to whom assignment was made he rebuked Plaintiff in a demeaning manner by stating: "What? you are correcting me now? Go work on my 'expletive' airplane."

77.    After the exacerbation of the abusive work environment occurred in late 2018 when two of Plaintiff's white male co-workers were hand-picked instead of him to attend a school to receive formal training on the Global Express VGF testing. This decision was made or approved by Operations Manager Heasley who, of course, was aware of his desire and availability for such training, particularly since complex tasks involving VFG testing are usually assigned to him. Completion of this training  was to enable the facility to be a certified VFG testing.

78.     After the two technicians returned from their training for VFG vibration testing, Plaintiff was still assigned the task of conducting the complicated VFG vibration testing with no formal training or assistance from anyone including the two newly trained technicians.

79.     Yet, Plaintiff was able to correctly execute that task on many aircraft, each within the course of his shift, but only by independently and laboriously determining how to do them efficiently.

80.     As other technicians were only able to complete the VFG vibration testing after days on the assignment, Plaintiff was directed by his supervisors to train other A&P technicians on that procedure.

81.     Although MURRAY was aware of and felt the effect of being assigned tasks that his white coworkers refused to do – either because they were undesirable or because of the difficulty or high risks of them - he never refused to perform them, nor was he ever afforded a choice to decline to accept those the abusive and discriminatory assignments.

82.     In March 2020, Plaintiff and others in his classification were furloughed due to COVID-19. Being away from the hostile and abusive work environment provided Plaintiff with not only a respite from the unbearably racial toxic environment, but also gave him an opportunity to receive some psychological assistance and relief, and to reflect on the racial hostilities he had endured during his almost 20-year career at LEARJET.

83.     When asked to return in February 2021, despite his desire to return to gainful employment, the trepidation and psychological burden of returning to that racially hostile and abusive work environment compelled  him to remain away, and he tendered his resignation.

84.     Plaintiff continued to experience the emotional and physical harm that he suffered

from the abusive and hostile work environment and the unlawful disparate treatment discrimination, and well as the increased unwarranted scrutiny and hostilities and abuse in retaliation for opposing the unlawful practices alleged herein, and as will be supported by the records of the Company and those of OFCCP.

### VII.    CLAIMS FOR RELIEF

### COUNT I
### (CLAIM FOR RELIEF: DISPARATE TREATMENT RACE DISCRIMINATION IN VIOLATION OF TITLE VII

85.   Plaintiff re-alleges ¶¶ 1-4, 6 – 8, 10, 7 – 14, and 18 - 57 above as though set forth herein.

86.   LEARJET did not treat Caucasian and non-black employees, or black employees who did not complain about race discrimination, in the same way it treated  MURRAY.

87.   MURRAY'S race was a motivating factor in LEARJET'S conduct and treatment of him, and LEARJET discriminated against him with respect to compensation, terms, and conditions or privileges of employment.

88.   LEARJET conduct was racially disparate from the way it acted towards and treated other non-black employees.

89.   As a direct, natural, proximate, and foreseeable result of the actions of LEARJET, MURRAY has suffered and will continue to suffer damages including, but not limited to, past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

90.   The race discrimination Plaintiff suffered, in violation of his statutory right to be free from such discrimination, constitutes irreparable harm for which there is no adequate remedy at law.

91.    MURRAY is entitled to recover reasonable attorney's fees and mitigation expenses pursuant to 42 U.S.C. § 2000e-5(k) for his Title VII claims; and

WHEREFORE, Plaintiff, prays that this Court will:

*One*, issue a declaratory judgment that LEARJET practices toward MURRAY violated his rights against discrimination under Title VII.

*Two*, enjoin LEARJET and its agents from violating MURRAY's statutory rights under Title VII and to make him whole through reinstatement, back pay and restoration of seniority and benefits.

*Three*, enter a judgment for MURRAY and against LEARJET for damages.

*Four*, grant MURRAY his costs and reasonable attorney's fees pursuant to 42 U.S.C. § 2000e-5(k); and

*Five*, grant MURRAY such other and further relief as the circumstances and law provide.

### COUNT II
### (CLAIM FOR RELIEF: DISPARATE TREATMENT RACE DISCRIMINATION IN VIOLATION OF FCRA

92.    Plaintiff re-alleges ¶ 1- 2, 5, 7, 9 – 12, 15 – 16,  and 18 - 57 above as though set forth herein.

WHEREFORE, Plaintiff, prays that this Court will:

*One,* issue a declaratory judgment that LEARJET practices toward MURRAY violated his rights against discrimination under FCRA.

*Two*, enjoin LEARJET and its agents from violating MURRAY's statutory rights under Title VII and to make him whole through reinstatement, back pay and restoration of seniority and benefits.

*Three*, enter a judgment for MURRAY and against LEARJET for damages.

*Four*, grant MURRAY his costs and reasonable attorney's fees pursuant to § 760.11(5), FLA. STAT. (2019);  and,

*Five*, grant MURRAY such other and further relief as the circumstances and law provide.

### COUNT III
### (CLAIM FOR RELIEF: DISPARATE TREATMENT RACE DISCRIMINATION IN VIOLATION OF SECTION 1981)

93.   Plaintiff re-alleges ¶¶1- 4, 6, 10, 11 – 12, 17 - 57 above as though set forth herein.

WHEREFORE, Plaintiff, prays that this Court will:

*One*, issue a declaratory judgment that LEARJET practices toward MURRAY violated his rights against discrimination under Section 1981.

*Two*, enjoin LEARJET and its agents from violating MURRAY's statutory rights under Title VII and to make him whole through reinstatement, back pay and restoration of seniority and benefits.

*Three*, enter a judgment for MURRAY and against LEARJET for damages.

*Four*, grant MURRAY his costs and reasonable attorney's fees pursuant to 42 U.S.C. § 2000e-5(k); and

*Five*, grant MURRAY such other and further relief as the circumstances and law provide.

### COUNT IV

### (CLAIM FOR RELIEF: HOSTILE WORK ENVIRONMENT- INCLUDING CONSTRUCTIVE DISCHARGE- RACE DISCRIMINATION IN VIOLATION OF TITLE VII)

94.   Plaintiff re-alleges ¶¶ 1-4, 6 – 8, 10, 7 – 14, and 24 – 84, above as though set forth herein.

95.   Plaintiff is a member of a protected class of black citizens.

96.   At all pertinent times of this action, Plaintiff was and is qualified for the position of A&P Technician.

97.   During the course of Plaintiff's employment with the Defendant, Plaintiff was subjected to discriminatory conduct by supervisors, as more fully described in paragraphs 24 – 84 above.

98.   Plaintiff did not welcome the offensive acts or statements and it did not directly or indirectly invite or solicit them by his own acts or statements.

99.   The offensive acts or statements were so severe or pervasive that they materially altered the terms or conditions of Plaintiff's employment.

100. A reasonable person - someone not overly sensitive - would have found that the offensive acts and statements materially altered the terms or conditions of that person's employment.

101. Plaintiff believed that the offensive acts and or statements materially altered the terms or conditions of his employment.

102. Defendant's supervisors who engaged in the offensive acts and treatment included Jim Heasley Ramon Rios, Tim Freeman, Jaime Pelchat and Bob Conroy, and other supervisors who were aware of it included Rich Meilert, Ron Lowe, Gary Sevarino and Gabriel Zaidman.

103. The supervisors in the preceding paragraph harassed Plaintiff because of his race.

104. The harassment created a hostile work environment for Plaintiff.

105. Caucasians A&P Technicians and other non-black male employees employed by Defendant, in similar level roles were and are not being subjected to the same conduct

referred to in paragraphs 54 - 84 of this First Amended Complaint.

106. The Defendant's discriminatory behavior was part of a custom, pattern and practice of unlawful harassment and discrimination of employees who are black.

107. The racially hostile work environment and related working conditions created by the Defendant and which Plaintiff had to endure became so intolerable that a reasonable person in his  position would have felt compelled to resign.

108. As a direct and proximate result of the foregoing, Plaintiff has suffered and continued to suffer embarrassment, humiliation, emotional distress, and other forms of damage.

109. Plaintiff has suffered damages of an ongoing and continuous nature.

WHEREFORE, Plaintiff requests that this Honorable Court:

   *One*, Enter judgment in Plaintiff's favor and against the Defendant for its violations of Title VII;

   *Two,* Award Plaintiff actual damages suffered, including lost wages and any other damages allowed to be recovered in a Title VII action;

   *Three,* Award Plaintiff compensatory damages under Title VII for embarrassment, anxiety, humiliation, and emotional distress that Plaintiff has suffered and continues to suffer;

   *Four,* Award Plaintiff prejudgment interest on her damages award;

   *Five,* Enjoin the Defendant, its officers, agents, employees, and anyone acting in concert with them, from discriminating, harassing and retaliating against Plaintiff and any employee;

   *Six,* Award Plaintiff reasonable costs and attorney's fees; and Grant Plaintiff such other and further relief, as this Court deems equitable and just.

## COUNT V

### (CLAIM FOR RELIEF:  HOSTILE WORK ENVIRONMENT- INCLUDING CONSTRUCTIVE DISCHARGE- RACE DISCRIMINATION IN VIOLATION OF  FCRA

110. Plaintiff re-alleges ¶ 1- 2, 5, 7, 9 – 12, 15 – 16,  and 18 – 57, 94 - 109 above as though set forth herein.

WHEREFORE, Plaintiff requests that this Honorable Court:

*One*, Enter judgment in Plaintiff's favor and against the Defendant for its violations of FCRA;

*Two,* Award Plaintiff actual damages suffered, including lost wages and any other damages allowed to be recovered in a FCRA action;

*Three,* Award Plaintiff compensatory damages under FCRA for embarrassment, anxiety, humiliation, and emotional distress that Plaintiff has suffered and continues to suffer;

*Four,* Award Plaintiff prejudgment interest on her damages award;

*Five,* Enjoin the Defendant, its officers, agents, employees, and anyone acting in concert with them, from discriminating, harassing, and retaliating against Plaintiff and any employee;

*Six,* Award Plaintiff reasonable costs and attorney's fees; and Grant Plaintiff such other and further relief, as this Court deems equitable and just.

## COUNT VI
### (CLAIM FOR RELIEF: HOSTILE WORK ENVIRONMENT – INCLUDING CONSTRUCTIVE DISCHARGE - RACE DISCRIMINATION IN VIOLATION OF  SECTION 1981

111.  Plaintiff re-alleges ¶ 1- 2, 5, 7, 9 – 12, 15 – 16,  and 18 – 57, 94 - 109 above as though set forth herein.

WHEREFORE, Plaintiff requests that this Honorable Court:

***One***, Enter judgment in Plaintiff's favor and against the Defendant for its violations of Section 1981;

***Two,*** Award Plaintiff actual damages suffered, including lost wages and any other damages allowed to be recovered in a Section 1981 action;

***Three,*** Award Plaintiff compensatory damages under FCRA for embarrassment, anxiety, humiliation, and emotional distress that Plaintiff has suffered and continues to suffer;

***Four,*** Award Plaintiff prejudgment interest on her damages award;

***Five,*** Enjoin the Defendant, its officers, agents, employees, and anyone acting in concert with them, from discriminating, harassing, and retaliating against Plaintiff and any employee;

***Six,*** Award Plaintiff reasonable costs and attorney's fees; and Grant Plaintiff such other and further relief, as this Court deems equitable and just.

## COUNT VII
## (CLAIM FOR RELIEF: OPPOSITION CLAUSE  RETALIATION IN VIOLATION OF  TITLE VII

112.    Plaintiff re-alleges ¶ 1- 2, 5, 7, 9 – 12, 15 – 16,  and 54 - 84 above as though set forth herein.

113. Defendant retaliated against Plaintiff because he took steps to enforce his lawful rights under Title VII.

114. Plaintiff believed, in good faith, that the race-based and retaliatory behavior to which he was subjected, and about which he also complained, by Defendant, and beginning in late 2018 early 2019 and continuing through his separation from Defendant's employ  April 2021**,** constituted unlawful employment practices under, among other statutory

enactments for racial equality under the law, Title VII, and his beliefs were objectively reasonable.

115. The actions of the Defendant, through its supervisors, in response to Plaintiff's opposition to those behaviors, employment actions and the inaction of Defendant in response to her complaints would have been materially adverse to a reasonable employee and were harmful to the point that they could well dissuade a reasonable worker from opposing an unlawful employment practice.

116. But for Plaintiff's good faith opposition to an unlawful employment practice - his engagement in protected activity under Title VII - he would not have suffered the adverse actions described herein.

117. As a result of Defendant's unlawful conduct, Plaintiff suffered mental and emotional distress in an amount to be determined at trial by the enlightened conscience of an impartial jury.

118. The Plaintiff has also suffered lost wages and benefits of employment which he also seeks to recover from the Defendant.

119. As a direct, natural, proximate, and foreseeable result of the actions of the Defendant, Plaintiff has suffered past and will suffer future pecuniary losses, emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

120. The unlawful retaliation that Plaintiff has and is suffering, in violation of the statutory right to be free from such retaliation, constitutes irreparable harm for which there is no adequate remedy at law.

121. Plaintiff is entitled to recover reasonable attorneys' fees and litigation expenses, pursuant to relief permitted by Title VII.

WHEREFORE, Plaintiff, prays that this Court will:

*One*, issue a declaratory judgment that the Defendant's practices toward Plaintiff violated his rights against retaliatory discrimination under Title VII.

*Two*, enjoin the Defendant and its agents from continuing to violate Plaintiff's statutory rights under Title VII and to make Plaintiff whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Plaintiff and against the Defendant for damages;

*Four*, grant Plaintiff her costs and reasonable attorney's fees pursuant to 42 U.S.C. § 2000e-5(k);

*Five*, grant Plaintiff such other and further relief as the circumstances and law provide.

### COUNT VIII
### (CLAIM FOR RELIEF: OPPOSITION-CLAUSE RETALIATION IN VIOLATION OF FCRA

122.   Plaintiff re-alleges ¶ 1- 2, 5, 7, 9 – 12, 15 – 16, 54 – 84, and 112 – 121, above as though set forth herein.

WHEREFORE, Plaintiff, prays that this Court will:

*One*, issue a declaratory judgment that the Defendant's practices toward Plaintiff violated his rights against retaliatory discrimination under FCRA.

*Two*, enjoin the Defendant and its agents from continuing to violate Plaintiff's statutory rights under FCRA and to make Plaintiff whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Plaintiff and against the Defendant for damages;

*Four*, grant Plaintiff her costs and reasonable attorney's fees pursuant to § 760.11(5), Fla. Stat. (2019); and,

*Five*, grant Plaintiff such other and further relief as the circumstances and law provide.

## COUNT IX
### (CLAIM FOR RELIEF: OPPOSITION-CLAUSE RETALIATION IN VIOLATION OF SECTION 1981

123.   Plaintiff re-alleges ¶ 1- 2, 5, 7, 9 – 12, 15 – 16, 54 – 84, 112 – 115, and 117 – 121, above as though set forth herein.

124.   Plaintiffs' protected activity - his good faith opposition to the Defendant's practices he reasonably believed constituted an unlawful employment practice under Section 1981 - was a motivating factor that prompted defendant to take the address employment actions set forth herein.

WHEREFORE, Plaintiff, prays that this Court will:

*One*, issue a declaratory judgment that the Defendant's practices toward Plaintiff violated his rights against retaliatory discrimination under FCRA.

*Two*, enjoin the Defendant and its agents from continuing to violate Plaintiff's statutory rights under FCRA and to make Plaintiff whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Plaintiff and against the Defendant for damages;

*Four*, grant Plaintiff her costs and reasonable attorney's fees pursuant to § 760.11(5), Fla. Stat. (2019); and,

*Five*, grant Plaintiff such other and further relief as the circumstances and law provide.

---

## **JURY DEMAND**

Plaintiff demands trial by jury for all issues so triable by right.

Dated: March 30, 2023.

Respectfully submitted,

<u>Colin H.F. Richards, Esq</u>.
Colin H.F. Richards (FBN: 0109234)
Colinrichardslaw@gmail.com
Colin Richards Law, P.A.
900 Osceola Drive, Suite 201
West Palm Beach, FL 33409
Telephone: (561) 425-4000
*Counsel for Plaintiff Kevin Murray*